UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------x
RABBI NAFTALI HOROWITZ,                        Case No.

                        Plaintiff,            **COMPLAINT**

       v.

TOWN OF CLARKSTOWN, N.Y.,
TOWN COUNCIL OF THE TOWN OF
CLARKSTOWN, N.Y.,
ZONING BOARD OF APPEALS OF THE
TOWN OF CLARKSTOWN, N.Y.,

                        Defendants.
-----------------------------------------------------x

    Rabbi Naftali Horowitz ("Plaintiff"), by his attorneys, Savad Churgin and Storzer & Associates, P.C., as for his Complaint against the Defendants Town of Clarkstown, N.Y., the Town Council of the Town of Clarkstown, N.Y., and the Zoning Board of Appeals of the Town of Clarkstown, N.Y. (collectively, "Defendants"), alleges as follows:

## NATURE OF ACTION

    1.    Plaintiff commences this action to redress violations of his civil and constitutional rights as protected by the United States Constitution and the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. §§ 2000cc, *et seq.* ("RLUIPA"), and the New York Civil Practice Law and Rules Article 78. The Defendants violated these rights of the Plaintiff by their arbitrary, discriminatory, and burdensome imposition and implementation of land use regulations, which have prohibited Plaintiff from being able to adequately engage in communal prayer activity at his home.

    2.    Rabbi Horowitz owns a modest single-family detached residence in the Town of Clarkstown, New York ("Town").

3.     Consistent with State and local law, Rabbi Horowitz invites members of the Orthodox Jewish community to pray with him in his home, as there is currently no Orthodox Jewish synagogue located within walking distance.  However, the current size and layout of his home prevent him from fully engaging in his religious exercise.

4.     After the Town Supervisor advised Plaintiff to apply for an area variance to build the addition necessary for Rabbi Horowitz's prayer services and related religious activity, Plaintiff applied for such variance to the Town's Zoning Board of Appeals ("Zoning Board" or "ZBA").

5.     However, Defendant Zoning Board denied Plaintiff's application on arbitrary grounds, failing to apply the applicable law, treating him differently and worse than other applicants, and suggesting that Plaintiff should go elsewhere or seek to open a place of worship elsewhere, which is a separate land use subject to much more onerous restrictions under the Town's Code.

6.     Additionally, the Town adopted a zoning code requirement mandating that places of worship in residential districts within its jurisdiction may only be located on State and County roads, which are only a small fraction of the total number of roads within the Town.

7.     There are no State or County roads within reasonable walking distance of Rabbi Horowitz's home and the homes of members of the local Orthodox Jewish community, who are forbidden by their religious beliefs from driving on the Sabbath.  Attempting to walk to the nearest such roadway from Rabbi Horowitz' home would be particularly dangerous.

8.     These actions have been taken against a backdrop of hostility and discrimination against Orthodox Jews in the Town, with the Town having gone so far as to interfere with and acquire another property that was under contract to be purchased by an Orthodox Jewish school. Comments describing fear and hostility to Orthodox Jews and statements opposed to that

community living and worshipping in Clarkstown (including "[i]t's a cult. Not a religion. Should not exist") were made at public meetings, to news reports, and on local social media pages. Local officials met with an organization founded upon such animus toward the Orthodox community.

9.     The ZBA's decision, and the Town's road requirement substantially burden Rabbi Horowitz' ability to fully engage in his religious exercise. The imposition and application of its land use regulations are both unreasonable and discriminate against him and Orthodox Jews on the basis of religion.

## PARTIES

10.     Plaintiff RABBI NAFTALI HOROWITZ is an individual who resides in the Town of Clarkstown, New York.

11.     Defendant TOWN OF CLARKSTOWN ("Clarkstown" or the "Town") is a municipal corporation duly formed and existing pursuant to the laws of the State of New York.

12.     Defendant TOWN COUNCIL OF THE TOWN OF CLARKSTOWN (the "Town Board" or "Town Council") is the municipal legislative body authorized by New York Town Law § 261 to adopt zoning and land use regulations for Clarkstown.

13.     Defendant ZONING BOARD OF APPEALS OF CLARKSTOWN, N.Y. is the municipal legislative body authorized by New York Town Law § 267-b to review zoning related appeals for Clarkstown.

14.     Each of these Defendants is a "government" within the meaning of 42 U.S.C. § 2000cc-5(4)(A).

## JURISDICTION AND VENUE

15.    The subject matter jurisdiction of this Court is founded upon 28 U.S.C. § 1331 (federal question jurisdiction) in that this action is brought under 42 U.S.C. §§ 2000cc, *et seq.*, and 42 U.S.C. § 1983.  This Court also has supplemental jurisdiction over Counts VII under 28 U.S.C. § 1367(a) for Plaintiff's claims brought under New York law as they arise from the same set of facts and circumstances as Plaintiff's federal claims and are so related to those claims that they form part of the same case or controversy.

16.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) in that all of the events giving rise to the claims herein occurred in this district and the Defendants are subject to personal jurisdiction in this district as of the commencement of this action.

## FACTUAL ALLEGATIONS

### Plaintiff's Property and Its Use

17.    Rabbi Naftali Horowitz owns certain real property located at 4 Center Lane, New City, New York (the "Property").

18.    The Property is identified on the Clarkstown Tax Roll as Map 50.20-2-17, formerly known as 18-A-22.37.

19.    Rabbi Horowitz moved to the Property in 2021 with his wife Hinda and their young children.

20.    The Property is located in the Town of Clarkstown in its "R-15" ("Medium Density") zoning district.

21.    The Property is 0.35 acres in size.

22.    Several home occupations are located within the neighborhood, including a home

day care, a contractor, and a consulting company.

23.    There is a Citgo Gas station approximately two blocks from the Property.

24.    The Property is improved with a modest single-family home, which is approximately 2,900 square feet in size.

25.    Rabbi Horowitz practices Orthodox Judaism.

26.    Rabbi Horowitz is the latest in nine generations of rabbis in his family.

27.    Rabbi Horowitz utilizes a portion of his family's home on the Property for Jewish prayer.

28.    Rabbi Horowitz believes that communal prayer in the Jewish faith requires a *minyan*, or quorum of at least ten adult males over the age of the thirteen, but does not require that the prayer be in a formal or permanent setting such as a synagogue.

29.    He also believes that certain crucial components of the Jewish prayers may only be said with a *minyan*. These include, but are not limited to, reading from the Torah scroll (mandated for Saturday morning, Saturday afternoon, Mondays, Thursday and on certain religious holidays) and the recital of the Kaddish, which is inserted at certain parts of the daily prayers and is also said by mourners following the death of a parent or other close relative.

30.    Under Orthodox Jewish law, Rabbi Horowitz believes that one is duty bound to assemble a quorum and partake in communal prayer (as opposed to praying alone) whenever it is possible to do so. In addition to the inherent obligation to pray with a *minyan*, some of the most important components of the Jewish prayers (discussed above) are exclusive to communal prayer.

31.    Jewish religious observance permits prayer in a private home.

32.    Engaging in communal prayer in a private dwelling does not transform the private dwelling into a "synagogue."

33.    Based on their sincerely held religious beliefs, Rabbi Horowitz and the other attendees to prayers in his home do not drive on the weekly Sabbath (called "*Shabbos*" and which occurs from sundown on Friday night until sundown on Saturday night) or on a number of Jewish holidays.

34.    These beliefs create a requirement that the location to pray be within reasonable walking distance of congregants' homes.

35.    Such walking distance is limited by, among other things, the physical limitations of congregants, including the elderly, disabled, parents and young children.

36.    There is no Orthodox synagogue within walking distance of the Property.

37.    Rabbi Horowitz sincerely believes that he must provide a location to lead prayers for Jews that live in the area and that this location must be within walking distance of the attendees.

38.    After Rabbi Horowitz moved to the Property, other Orthodox Jewish residents of the neighborhood began asking to come pray with him.

39.    The purpose of these requests was to assemble the necessary quorum of 10 men in order to say the required prayers.

40.    The number of people attending such prayers has grown to approximately twenty to twenty-five adults.

41.    Rabbi Horowitz leads prayers at the Property on Friday evenings for approximately 1.5 hours after sunset, on Saturday mornings for approximately 2-3 hours, and for another one hour on Saturday in the late afternoon/early evening.

42.    A very small number of families (approximately three or four) will drive to the Property on Friday evenings before *Shabbos* begins at sundown, leave their cars during the day on Saturday, and drive home after sunset on Saturdays.

**Burden on Plaintiff's Religious Exercise**

43.     The current layout and size of Rabbi Horowitz' home imposes significant burdens on his religious exercise, and on those who pray with him.

44.     The current space is not large enough to accommodate all those who seek to pray with him.

45.     Rabbi Horowitz needs additional space to lead prayers that will accommodate all of those who need an Orthodox Jewish place to pray within his neighborhood.

46.     Overcrowding in the current space disrupts the worshipful atmosphere with myriad distractions.

47.     The Property currently has one restroom available for those who join Plaintiff for prayers, which is located off of the worship room.

48.     These restroom facilities are not sufficient for the needs of the individuals who attend prayers at the Property.

49.     The restroom facilities are accessed by passing through the worship space, and therefore women cannot access them during prayers.

50.     Children also cannot access the restroom facilities without significantly disrupting the ongoing prayers.

51.     There is no dedicated space for women to pray at the Property.

52.     In accordance with traditional Jewish practice and Rabbi Horowitz' beliefs, men and women must be separated during prayers.

53.     Men and women occupying the same area during prayers would violate Plaintiff's sincerely held religious beliefs.

54.     Currently, all attendees at the prayers utilize the same entrance, which causes

problems with women and men crossing into the same area and detracts from the worship experience.

55.    Women who wish to attend prayers must sit in Rabbi Horowitz's dining room and watch them through the doorway.

56.    Women traditionally attend prayers after having a baby, to watch their husbands be called to the Torah and receive a special blessing.  Currently, because of the limitations of the Property, any woman who wishes to attend to hear such a blessing must sit in Rabbi Horowitz's dining room.

57.    Plaintiff cannot offer facilities for teenage girls to comply with a religious program that they are required to do by their Orthodox Jewish schools to attend Shabbos morning prayers on Saturday mornings.

58.    The physical limitations of Rabbi Horowitz' home has also led to severe overcrowding during the Jewish High Holidays, when many women attend.

59.    Rabbi Horowitz's current facilities also lack a *mikveh* (which is a traditional Jewish ritual bath) that he deems is required under Jewish law.

60.    There is no mikveh that is accessible for those in the neighborhood on Shabbat and holidays.

61.    The closest mikveh to the Property is located in the Town of Ramapo, which is not a reasonable walkable distance from Plaintiff's neighborhood.

62.    Because the mikveh is so far away, Jewish community members are unable to go to a mikveh on the Sabbath or holidays.

63.    Individuals attending prayers at Rabbi Horowitz' home also bring their children.

8

64.    Rabbi Horowitz believes that it is important that Jewish children begin attending prayers, so that they can become comfortable in the synagogue and become ready to take on their adult religious responsibilities.

65.    Approximately twenty children attend prayers at the Property with their parents each weekend.

66.    The children who attend are led by a dedicated adult through prayers, and then leave the worship space.

67.    Rabbi Horowitz seeks to offer additional religious programming for children during the prayers, but cannot do so now due to lack of space.

68.    The current space does not have an area for dedicated children's programming during prayers.

69.    The lack of space for children to be accommodated during the prayers means that children must instead play outside.

70.    Rabbi Horowitz also seeks to offer adult religious education, such as religious lectures on Shabbos afternoons and on Jewish holidays, but cannot do so now due to a lack of space.

**Plaintiff's Discussions with Town Officials**

71.    On or around June 10, 2025, Rabbi Horowitz attended a meeting with Clarkstown officials, including Supervisor Hoehmann and Clarkstown Town Attorney Kevin Conway, and representatives of approximately eight Orthodox Jewish communities.

72.    At that meeting, Supervisor Hoehmann provided copies of a map printout that labelled one of the community's properties as a "shul"[1] and said that is unacceptable.

---

[1] "Shul" is a Yiddish term for synagogue.

73.    Rabbi Horowitz explained at that meeting that his community needed a place for his Jewish individuals to pray on *Shabbos*.

74.    He explained to the Town officials that such a location must be within a ten to fifteen minute walk from where his community lives because they are religiously prohibited from driving on *Shabbos*.

75.    Rabbi Horowitz explained that he used space in his house for prayers on *Shabbos* but that his community was growing and that he could not accommodate everyone and would need more space.

76.    In response, Supervisor Hoehmann advised Rabbi Horowitz that he should apply to the ZBA for an area variance.

77.    Supervisor Hoehmann also advised Rabbi Horowitz that as long as he lived in the house, the Property would be considered a single-family residence, and would not be subject to the Town's State/County Road Law (discussed below), which it would be if it was deemed a formal place of worship.

78.    As a result, Rabbi Horowitz was advised by the Town that he could continue to have prayers at the Property on *Shabbos* as long as he received the area variances to increase the size of his house to make room for all of his community members to pray.

**Applicable Land Use Regulations**

79.    New York Town Law § 267-b authorizes the ZBA to review zoning-related appeals for Clarkstown and to grant area variances.

80.    In making its determination on an area variance, under New York law, the ZBA must take into consideration the benefit to the applicant if the variance is granted, as weighed against the detriment to the health, safety and welfare of the neighborhood or community by such

grant. In making such determination the board shall also consider: (1) whether an undesirable change will be produced in the character of the neighborhood or a detriment to nearby properties will be created by the granting of the area variance; (2) whether the benefit sought by the applicant can be achieved by some method, feasible for the applicant to pursue, other than an area variance; (3) whether the requested area variance is substantial; (4) whether the proposed variance will have an adverse effect or impact on the physical or environmental conditions in the neighborhood or district; and (5) whether the alleged difficulty was self-created, which consideration shall be relevant to the decision of the board of appeals, but shall not necessarily preclude the granting of the area variance.

81.    Clarkstown Zoning Code § 290-10 provides that all new construction or development, and every change, enlargement or relocation of use, and every reconstruction or structural alteration of a building or nonbuilding use and every change in bulk shall conform to the use and bulk regulations of this chapter. All new buildings and all newly developed land and nonbuilding uses may be used for any purpose permitted or required by the regulations of the appropriate district, and for no other purpose whatsoever.

82.    Clarkstown Zoning Code § 290-11 provides the use and bulk tables.

83.    Pursuant to Bulk Table 12, in an R-15 zone, the Maximum Floor Area Ratio is 0.23, the Minimum Side Yard        is 20.0 ft, the Maximum Total Side Yard is 40ft and Maximum Lot Coverage is 23%.

84.    Clarkstown Zoning Code § 290-20.I(7) requires that in residential districts, "[a]ll uses other than single-family residences shall have minimum frontage of 100 feet and access to either a state or county major or secondary road as classified on the Town Official Map."

**Plaintiff's Application and ZBA Decision**

85.    Based on the advice from Supervisor Hoehmann at the June 10, 2025 meeting, on July 10, 2025, Rabbi Horowitz submitted an application to Defendant ZBA seeking an area variance (the "Application").

86.    The Application did not seek to change the use of Plaintiff's home to a "place of worship."

87.    Rabbi Horowitz uses and intends to continue to use the Property as a single-family home.

88.    The narrative for the Application stated:

The subject property, located at 4 Center Lane in New City, lies within the R-15 zoning district and is currently improved with a single-family residence. The homeowner, a local rabbi, resides at the property full time and is proposing an addition to the existing home.

The proposed addition will provide additional living space for the family and modest accommodations for small gatherings related to religious observance. Specifically, the rabbi is seeking to create a space that can be used as a prayer room for a small group of community members — strictly for use on the Jewish Sabbath (Friday evening through Saturday evening). Typical gathering times will include:

- Friday night: From sunset until approximately two hours later

- Saturday morning: 9:30 AM to 11:30 AM

- Saturday afternoon: Approximately one hour before sunset until nightfall

Attendance will range from 20 to 30 individuals, all of whom reside within walking distance of the home. As driving is strictly prohibited under Jewish law on the Sabbath, all attendees will arrive on foot. There will be no vehicle traffic associated with these gatherings, and no weekday or evening use is proposed. This limited and respectful use will have no adverse impacts on neighborhood traffic, parking, or quality of life.

In addition to the main-level expansion, the basement will provide additional space for the rabbi's family and a small play area for children during services. This helps ensure that children are safely supervised

indoors, further minimizing any potential disturbance to neighbors.

The applicant is requesting the following area variances in order to proceed:

| Zoning Requirement | Required | Proposed |
|---|---|---|
| Minimum Side Yard | 20.0 ft | 14.9 ft |
| Maximum Development Coverage (%) | 23.0% | 37.8% |
| Floor Area Ratio (FAR) | 0.23 | 0.41 |
| Parking Ratio | 2 | 1 |

The homeowner respectfully submits this request with the assurance that the proposed addition is intended solely to serve the household's needs and limited religious gatherings once per week. The intent is not to operate a formal house of worship, but simply to provide a peaceful and respectful place for neighbors to observe their weekly traditions.

We appreciate your consideration of this application and your service to the community.

89.    The Town delayed consideration of Rabbi Horowitz's Application.

90.    Rabbi Horowitz submitted the Application on June 10, 2025.

91.    More than two months passed before the Deputy Building Inspector responded to Rabbi Horowitz.

92.    Such a delay was irregular for the Town.

93.    The expediter for Rabbi Horowitz's Application e-mailed the Deputy Building Inspector on the following days to find out of the application had been sent to the ZBA:

    A.    August 13, 2025

    B.    August 21, 2025

    C.    August 25, 2025

    D.    August 26, 2025

    E.    September 2, 2025

    F.    September 10, 2025

G.      September 15, 2025

94.     The expediter for Rabbi Horowitz's Application also left voicemails for the Deputy Building Inspector during this time-period.

95.     The Deputy Building Inspector did not respond to the expediter for Rabbi Horowitz's Application until September 25, 2025, more than two months after Rabbi Horowitz submitted it.

96.     The Deputy Building Inspector's September 25, 2025 response listed three items in the Application that Rabbi Horowitz had to address. The expediter addressed these items and was advised by the Deputy Building Inspector that the Application was submitted to the ZBA on October 8, 2025.

97.     On October 20, 2025, the expediter was advised that the ZBA hearing was set for November 10, 2025, four months after Rabbi Horowitz submitted the Application.

98.     On November 10, 2025 the ZBA held a public hearing regarding Rabbi Horowitz's application (the "Hearing").

99.     At the Hearing, Rabbi Horowitz' attorney introduced the application, stating that Rabbi Horowitz is seeking variances to build an extension onto a single-family house. The extension will be utilized for Rabbi Horowitz for prayer purposes on Friday nights and Saturdays, for *Shabbos*.

100.    Rabbi Horowitz's attorney told the ZBA the variances requested are for floor area ratio (limit is 0.23; requested is 0.41); side setback  (required is 20 feet; requested is 14.9 feet); maximum development coverage (limit is 23% in the R-15 zone; requested is 37.8%).

101.    Rabbi Horowitz's attorney also stated Rabbi Horowitz was requesting a variance for parking spaces as he is required to have two spaces, and sought to have one.

102.    Rabbi Horowitz has no need for a garage space.

103.    Rabbi Horowitz's attorney advised the ZBA that this is not a large *shul* that requires many parking spaces as it will only be utilized during the prayer portion on Friday nights and Saturday by members of the Orthodox Jewish community, who do not drive on the weekends.

104.    Plaintiff's attorney also stated that the Orthodox Jewish community needs a place to pray together because there is no place within the community other than the Rabbi Horowitz' house.

105.    He also stated the house is not sufficient for Rabbi Horowitz's needs, the needs of his family, and the needs of the community joining him for prayers, and that this was the reason for the variances to expand the house.

106.    Rabbi Horowitz requested a 1,447-square foot gathering area to be added to his home.

107.    Rabbi Horowitz' expediter stated that in the back of the house, the first floor will have a gathering area, an addition for private use of a dining room, and a small hallway with a lobby area.  The basement level will have a hallway, an area for children, a private mikveh, a bathroom, and a storage area.

108.    Rabbi Horowitz's attorney advised the ZBA that under New York State and federal law, Planning and Zoning Boards are required to provide deference for religious uses.

109.    Rabbi Horowitz' attorney informed the ZBA multiple times that the Rabbi would accept and comply with conditions that may be imposed in order to reduce any impacts of the addition.

110.    Rabbi Horowitz's attorney advised the ZBA that Plaintiff has no issue with complying with the comment by the Town's consultant stating a SEQRA analysis may be required.

111.    The ZBA was shown elevation plans identifying the existing house and the proposed addition, and advised that only a small portion of the addition would be visible from the front of the Property.

112.    However, based on comments regarding placing additional screening, Rabbi Horowitz's attorney stated that Rabbi Horowitz will install whatever screening the ZBA would recommend.

113.    Rabbi Horowitz's attorney assured the ZBA that Rabbi Horowitz has made every effort to make the proposed addition appear as part of his residential use.

114.    He also stated that he was willing to hear suggestions from the ZBA, to ensure that the addition would not change the character of the neighborhood.

115.    Rabbi Horowitz's attorney stated that there is no feasible alternative to an area variance, to permit the Rabbi to continue to hold prayers in his home.

116.    Rabbi Horowitz's attorney addressed the balancing test that the ZBA must look at in deciding whether to grant an area variance.

117.    The ZBA was advised that any impacts of the requested area variance was balanced by the other factors to be applied in consideration of the variance.

118.    There would be no adverse environmental or physical effects.  The use of the Property is, and will continue to be, a single-family residence, with a portion of the home to be used by the Rabbi on Friday afternoon and evening until Saturday night to invite people to pray in.

119.    Other than a handful of families that may drive prior to the beginning of *Shabbos*, community members will not be driving their cars to the Property or parking in front of the house, but will instead be walking there.

120.    The proposed addition will enhance, rather than detract from the neighborhood and because several Orthodox Jewish members of the community need the space to worship.

121.    The variance is not a "self-created hardship" because Plaintiff's use is permitted on the Property.

122.    One of the ZBA members expressed concern that if Rabbi Horowitz's variance was granted, the Board needs to consider someone else coming in after for the same variance.

123.    One ZBA member asked whether the requested changes would fall under a use variance for a different use, rather than an area variance for the Rabbi's single-family residential use.  Rabbi Horowitz's attorney responded that they are applying for an area variance and that under New York State Law, a place of assembly for less than 50 people is considered an accessory use to a main use, so no use variance would be required.

124.    A ZBA member again inquired whether an area variance could achieve what the applicant needs.  Rabbi Horowitz's attorney explained that if the house would be categorized as a place of worship, the Town's State/County Road Law (see below) would require that the applicant be located on a county or state road.

125.    Town Supervisor Hoehmann previously told Rabbi Horowitz that the Town's State/County Road Law would not apply to his Property, *i.e.*, that the use would not change from a single-family detached residence to a place of worship, as long as he lives in the house.

126.    When one of the ZBA members stated concern about the increase in the floor area ratio and the maximum lot coverage, Rabbi Horowitz's attorney stated if the ZBA would feel more comfortable granting the variance with it being scaled down, Rabbi Horowitz would consider that.

127.    Members of the public and a deputy town attorney stated at the Hearing that the community members should pray at a synagogue in another location.

128.    Such a suggestion is not possible because the Orthodox Jewish community is prohibited from driving to such locations on *Shabbos* and there are no such locations within safe walking distance.

129.    At the Hearing, members of the public complained about the number of children outside Rabbi Horowitz' home, despite the fact that the requested variance would provide more space for children inside and alleviate such current activity.

130.    After everyone spoke at the public hearing, Rabbi Horowitz's attorney requested that the ZBA adjourn the Hearing until the next scheduled meeting in order to address the concerns raised at the Hearing.

131.    Deputy Town Attorney Kevin Hobbs questioned the attorney as to the reason for the adjournment.  Rabbi Horowitz's attorney stated that he had heard from the Board that the degree of the variances they are requesting might be too large for the Board to accept.

132.    The ZBA denied Rabbi Horowitz's attorney's request to continue the public hearing in order to work out compromises because there had been a public hearing and stated that the ZBA would vote on the variance that night.

133.    The ZBA routinely grants continuations of public hearings.

134.    The ZBA treated Rabbi Horowitz differently and worse than other applicants by denying Rabbi Horowitz's request to continue the public hearing.

135.    For example, at the prior ZBA meeting on October 27, 2025, the ZBA held a "Continuation of Public Hearing Appeal" for a variance for a second story addition to a single-family residence and for a bedroom, master suite, bathroom, play area, and a new set of stairs.

136.    Similarly, on September 8, 2025, the ZBA held a "Continuation of Public Hearing Appeal" for a variance to build a seasonal sunroom with a small deck on the second floor of a

home.

137.    The ZBA closed the public hearing and the ZBA members discussed the Application.

138.    One ZBA member stated that increasing the size of the existing home, even though it would stay as a single-family home, would only add to the problem of the existing use, would change the character negatively in the area, and would be undesirable.

139.    That same ZBA member asked: "How do you guarantee to the neighbors that the kids will stay inside?"

140.    That same ZBA member stated that there is no question that the harm is self-created, stating "[i]f you left the house the way it was fine, and now they want to increase the size of the house, they are creating the problem," which is not the standard to determine whether a harm is self-created.

141.    As such, Rabbi Horowitz was treated differently and worse than other variance applicants.

142.    Another ZBA member stated that the proposed addition will take away the common law right for others to have enjoyment in the community.

143.    Another ZBA member stated that the proposed floor area ratio was doubled and he doesn't see how it would not change the character of the neighborhood.  The member stated this despite the fact that the ZBA rejected Rabbi Horowitz's attorney's request to adjourn the meeting and make changes that the ZBA would accept.

144.    Similar sentiments were uttered by other members of the ZBA.

145.    The Deputy Town Attorney stated that it does not matter whether the requested variance is for religious use or not.  Such a statement was contrary to New York law.

146.    A ZBA member made a motion to decide that, after reviewing the five area variance criteria, the impact to the community outweighs the benefit to the applicant and to deny the application as proposed.

147.    This motion was made, and a vote was taken on the motion, despite the fact that the ZBA rejected Rabbi Horowitz's attorney's request to adjourn the meeting and make changes that the ZBA would accept.

148.    That motion passed unanimously, and Rabbi Horowitz's variance application was denied.

149.    The ZBA issued a Notice of Decision that was filed with the Clerk on December 18, 2025 (the "ZBA Decision").

150.    The ZBA Decision concluded that "an application of this nature could have been considered a request for a use variance."

151.    The ZBA came to this conclusion despite the fact that Rabbi Horowitz was not asking to change the use of his house, so a use variance was inapplicable.

152.    Upon information and belief, the ZBA has not come to such a conclusion with other applications for area variances, and thus Rabbi Horowitz was treated differently and worse than other applicants.

153.    The ZBA's conclusion is contrary to New York and local law.

154.    The ZBA came to this conclusion despite the fact that Supervisor Hoehmann had advised Rabbi Horowitz that he could apply for an area variance so long as he lived in the house.

155.    The ZBA came to this conclusion despite the fact that a place of assembly for less than 50 people under New York law is considered an accessory use to a main use, so that a use variance would not be required.

156.    The ZBA Decision admitted that New York State law "has determined that religious uses are inherently beneficial to the health, welfare and safety of the community and that efforts to accommodate religious uses should be considered."

157.    However, the ZBA refused to apply this principle to accommodate Plaintiff's religious use, instead ignoring the religious use that required the proposed variance.

158.    At the ZBA meeting, one of the Board members said that the ZBA needed to look at the variance request "whether it is religious reason," suggesting that the ZBA not consider the fact that "religious uses are inherently beneficial to the health, welfare and safety of the community and that efforts to accommodate religious uses should be considered."

159.    As stated above, the Deputy Town Attorney stated that for the Board's decision, it does not matter whether the requested variance is for religious use or not.

160.    The ZBA Decision also admitted that, under RLUIPA, "land use regulations should not be used to impose a substantial burden on religious uses in the absence of a compelling governmental interest."

161.    However, the ZBA Decision did not provide any analysis about a compelling governmental interest and did not find that there was a compelling governmental interest in denying Rabbi Horowitz's variance, or that an outright denial was the least restrictive means of achieving such an interest.

162.    The only conclusions of law that the ZBA Decision included were:

FIRST:  The Board of Appeals of the Town of Clarkstown pursuant to the provisions of Chapter 290-32(C)(1) of the Zoning Local Law of the Town of Clarkstown shall hear and determine appeals from any order, requirement, decision or determination of the Building Inspector.

SECOND:  The Board of Appeals, pursuant to Chapter 290-32 (C)(1), may grant a variation in the strict application of any provision of this ordinance.

163.    The ZBA Decision does not contain any other conclusions of law that would justify

the denial of Rabbi Horowitz's variance.

164.    The Findings of Facts in the ZBA's Decision contained significant errors.

165.    For example, in its Findings of Facts No. 8, the ZBA found that "[Rabbi Horowitz's attorney] stated that if this is determined to be a Shul or a place of worship, the property would need to be on a county road otherwise a use variance would be required which the Applicant cannot qualify for.  However, [Rabbi Horowitz's attorney] also stated the use is not for a huge Shul.  Small or huge, a Shul is a Shul, and Center Street is a Town road.  [The expediter] and proponents for the Applicant also testified that the intended use for the proposed addition is for a Shul or Synagogue."

166.    This Finding of Fact is factually incorrect.  As Rabbi Horowitz's attorney explained at the ZBA hearing, Rabbi Horowitz would continue living at the Property and under New York State Law, a place of assembly for less than 50 people is considered an accessory use to a main use.  Therefore, the use of the Property would remain unchanged from a single-family detached residence and no use variance would be required.

167.    This Finding of Fact also contradicts what Supervisor Hoehmann told Rabbi Horowitz, that as long as Rabbi Horowitz lived in the house, the Property's use would remain a residence and would not be subject to the Town's State/County Road Law (see below), meaning that a use variance would not be necessary.

168.    Similarly, Finding of Fact No. 10 states that Rabbi Horowitz's attorney stated that "the application will address the needs of the community.  No explanation was provided as to what comprised the community."  This is untrue.  Rabbi Horowitz's attorney stated at the Hearing that the prayer space would be utilized during the prayer portion on Friday nights and Saturday by members of the Orthodox Jewish community, who do not drive on *Shabbos*.

**Anti-Semitic Animus in the Town**

169.    The hostility demonstrated toward Rabbi Horowitz is the latest example of Clarkstown's documented history of religious animus towards religious institutions in general and Orthodox Jews in particular.

170.    As set forth more fully below, in 2016 Clarkstown adopted Local Law No. 5 of 2016 ("LL5"), which added section 290-20.I(7) to the Town Code, requiring for the first time that in residential districts, "[a]ll uses other than single-family residences shall have minimum frontage of 100 feet and access to either a state or county major or secondary road as classified on the Town Official Map" (the "State/County Road Law").

171.    Clarkstown Supervisor Hoehmann admitted that the Town's State/County Road Law was adopted in order to prevent non-residential developments such as religious institutions from locating in residential areas.

172.    Supervisor Hoehmann made these statements despite the fact that the New York Court of Appeals has held that there is an "inherently beneficial nature of churches and schools to the public." *Cornell Univ. v. Bagnardi*, 68 N.Y.2d 583, 594 (1986).

173.    In November of 2017, Clarkstown utilized that law to prevent a Christian church from building a structure and instead purchased the property from the church.  Clarkstown Supervisor Hoehmann stated that was "is another bold step in protecting Clarkstown from overdeveloping in residential neighborhoods while protecting the quality of life our residents demand and deserve."

174.    Clarkstown was a defendant in a 2020 lawsuit brought by Ateres Bais Yaakov Academy of Rockland, a school for Orthodox Jewish girls in grades pre-K through 12.  Ateres Bais Yaakov Academy of Rockland v. Town of Clarkstown et. al. SDNY Case Case 7:20-cv-

01399 (the "Ateres Lawsuit").

175.    Ateres Bais Yaakov alleged that Clarkstown engaged in discriminatory efforts to prevent its Orthodox Jewish school from closing on its purchase of a Property that was formerly a Baptist school and church.

176.    Ateres Bais Yaakov alleged that Clarkstown colluded with local residents hostile to Orthodox Jews by meeting to devise a plan to prevent Ateres Bais Yaakov's purchase of the Baptist school's property with a citizens' group called "Citizens United to Protect Our Neighborhood" ("CUPON"), which was formed for the express purpose of preventing Ateres Bais Yaakov from operating its school, to stop the acquisition of the property.

177.    Ateres Bais Yaakov alleged that CUPON was formed for the express purpose of preventing it from operating its school in Clarkstown.

178.    Ateres Bais Yaakov also alleged that Clarkstown denied its permit application "through a blatant misapplication of its zoning laws."

179.    The allegations made in that lawsuit included that the ZBA refused to hear Ateres Bais Yaakov's appeal of the Clarkstown Building Department's denial of its request for a building permit and, in the alternative, its application for an area variance.

180.    The religious animus of the Clarkstown community has also been demonstrated by statements by Clarkstown residents and neighbors. Many of the comments included anti-Orthodox dog whistles such as concerns about money, properties being on tax rolls, and destruction of public schools. These comments include:

> A.    A community member commented on an article about a Town Councilman referring to non-Orthodox Jews as "normal Jews" (*see* below), and stating: "Trust me there are way more people who applaud his ability to tell the truth about the issues facing the County. He is part of the legislators in Clarkstown helping us not to become the next East Ramapo or New Square";

B.     Another community member commented on that article: "Keep speaking the truth. . . . They obviously have little understanding that you are a powerful force behind keeping Clarkstown from becoming the next Kiryas Joel";

C.     At an informational meeting about Ateres Bais Yaakov's proposed school, while the Rabbi/Dean was introducing himself and the school, community members noisily walked out and there were shouts of "we don't want you";

D.     At that same informational meeting a community member shouted "you don't want us in yours, we don't want you in ours";

E.     At the November 27, 2018 Clarkstown Town Board meeting where public comments were held regarding Ateres Bais Yaakov's purchase of the property from the Grace Baptist Church (despite the fact that there were no pending applications by Ateres Bais Yaakov before the Board), a Town resident stated: "We are proud of our Town. We should renovate this building or knock it down and make a parking lot for the Nanuet School District.";

F.     The real estate broker who sold the property to Ateres Bais Yaakov stated that there were "anonymous threats that have been called in against himself and his family";

G.     Another Town resident stated that he "is begging the Town Board to look and see what happened to the Town of Ramapo. This cannot happen here.";

H.     A Town resident who was also a County legislator stated that she "has seen destruction with the schools up in Ramapo." She stated that "is a teacher at Spring Valley High School and she has lived it firsthand.";

I.     Another Town resident stated that "[t]he applicant" (even though there had been no application yet submitted) "will try to keep it as a religious land use. This is not going to be resolved here. How far is Clarkstown willing to go?";

J.     A community member from a neighboring town stated that the Ateres Bais Yaakov rabbi/dean is getting the money to purchase the property from bonds and that she "wants to reveal to the public that this is where he is getting money for the Grace Baptist Church.";

K.     A community member from a neighboring town who grew up in Clarkstown stated that she "does not want Nanuet to turn into Ramapo" and that "she and others do not mind paying extra taxes for the purchase of the Church. The Town of Clarkstown should

have worked harder and stepped in. She wants to keep Clarkstown and Nanuet special. The Town Board works for the people of this Town. She does not want the Nanuet School district to turn into an East Ramapo School.";

L.     Another Town resident stated that "this property will be run down within one year and Nanuet will be taken over along with the rest of Clarkstown".

M.     Another Town resident stated that he would like to know if the Ateres Bais Yaakov's Rabbi's school curriculum would be state mandated or whether the tax payers are going to be paying for it;

N.     Another Town resident stated that he would like to know what the additional tax burden would be if the school were to expand and if the school would be paying anything on their behalf or will this become a bill to the taxpayers of Clarkstown;

O.     Another Town resident  asked "[w]here exactly is this money coming from? This is an essential part of our town which is going to affect us every day.";

P.     Another Town resident asked whether the Town Council had any plans on filing any action(s) against the buying or the selling for a preliminary injunction while the Town has time to investigate all the concerns presented at that meeting;

Q.     Another Town resident stated that the property "would be perfect for Administrative Offices, Continuing Education, PTA Offices, storage and much more for the Nanuet School District. Let's hope that a proper solution can be made before it is too late.";

R.     At a On January 10, 2019, meeting held by CUPON, CUPON's attorney said that it was gratifying to be asked to join a team of people who have as their goal fighting against bullying and corruption, and was met with applause from the audience; and

S.     A local Facebook page called "Clarkstown What They Don't Want You to Know" contains many posts about Orthodox Jews and there are many comments that demonstrate hostility towards that community.  These include:

    a.  With respect to an article that was posted on December 4, 2025 titled "Will The Ultra-orthodox Split Rockland County If They Split Israel?" regarding conscripting ultra-Orthodox into the Israeli army, comments were made such as:

        i.     "Maybe they should start paying taxes in Rockland and

Orange counties";

    ii.    "Well they'll probably move back here if they're forced to serve in the Israeli military. Be careful what you wish for."; and

    iii.    "It's a cult. Not a religion. Should not exist."

    b.    With respect to an article that was posted on September 11, 2022 titled "Finally The Truth About The 'Education' Of Hasidic Children," comments were made such as:

    i.    "If these people choose to be ignorant and unemployed for life, that's their choice but I shouldn't have to provide welfare for them!";

    ii.    "these people don't worship God. they worship money."; and

    iii.    "This just proves how much power these people have."

    c.    On January 11, 2026, a post was made about the Orthodox community of Kiryas Joel, and a comment to this post was "Hasidic Law....STEAL, LIE, CHEAT."

181.    Residents also tried to encourage others to watch what they say so as to not be caught making discriminatory statements:

    A.    A community member at the information meeting about Ateres Bais Yaakov's proposed school in Nanuet (a hamlet in Clarkstown) stated "He's videotaping over here so be watch what you're saying please for the sake of Nanuet"

    B.    On January 10, 2019, CUPON held a meeting. The meeting was attended by Supervisor Hoehmann and a Clarkstown Councilmember. At that meeting, CUPON's counsel, Steven Mogel, provided advice to attendees, including Supervisor Hoehmann, on how to appear facially neutral rather than show discriminatory motives. The attorney:

    a.    told attendees that he would "[p]rovide advice/counsel about messaging in printed and digital materials";

    b.    told attendees that if they have hate in their heart they should "keep your mouth shut";

    c.    advised attendees to "avoid the word 'they'";

> d.     advised that "we need to be really careful, we need to be on message" using words such as "land use," "development," "overdevelopment," "compliance with the law," and "quality of life"; and
>
> e.     said that RLUIPA has been used as a "sword that has been wielded by bullies."

182.    Despite these admonitions, Clarkstown officials have made statements reflecting religious animus and receptiveness to community members' statements of religious animus:

> A.     A Town Councilman who voted in favor of the State/County Road Law posted on Facebook a few days after the Tree of Life Shooting in Pittsburgh in 2018, referring to non-Orthodox Jews as "normal Jews";
>
> B.     At the November 27, 2018 Clarkstown Board meeting where public comments were held regarding Ateres Bais Yaakov's purchase of the property from the Grace Baptist Church (where there was no application pending), Supervisor Hoehmann stated that "the Town cannot interfere with a private property matter between two parties, but the Town will strongly enforce our zoning laws and our building code within the entire Town of Clarkstown." (the audience clapped in response to this statement);
>
> C.     At that same meeting, in response to statements from the Ateres Bais Yaakov rabbi/dean stating that the school has achievements with Regents Exams and AP Exams and that he looks forward to being Clarkstown's new neighbor, Supervisor Hoehmann stated "there are significant concerns that our public have and need to be addressed";
>
> D.     At that same meeting, Supervisor Hoehmann asked "if the Rabbi was successful with his application, and the school were to open, what would the cost implications be to the Nanuet School District? Bussing, books, nursing care etc…" The Supervisor asked these questions despite the fact that such issues cannot be considered in land use applications;
>
> E.     At the conclusion of that meeting one Town council member stated "Your voices have been heard and your concerns have been noted";
>
> F.     At the conclusion of that meeting, another Town council member stated that he "understands how the communities are concerned about their neighborhoods" and that "[w]e are all in this together"; and
>
> G.     At the conclusion of that meeting, another Town council member

28

> stated that there is "a lot of work that is being done behind the scenes
> at the Town. This is a hot issue."

183.    In or around March of 2024, Clarkstown settled the *Ateres* lawsuit.  As part of the

settlement, Clarkstown's Town Board, the Town Zoning Board of Appeals, the Town's Planning

Board, and the Town's Building Inspector were all required to take a rigorous course on religious

liberty land use training, including on RLUIPA.

184.    In the Ateres Lawsuit, the Anti-Defamation League ("the ADL"), an independent

organization whose mission is to fight anti-Semitism and bias, submitted an *amicus curiae* brief.

185.    In its *amicus curiae* brief, the ADL recounts the history of religious animus in

Clarkstown and in Rockland County towards Orthodox and Hasidic Jews, stating:

> In Clarkstown, news of [Ateres]'s interest in purchasing the Property was met with
> thinly-veiled, and sometimes openly antisemitic, threats and sentiment. Community
> members called the move to Nanuet a "hostile invasion." Others at raucous public
> meetings shouted "go away, we don't want you, go back to Ramapo." Am. Compl.
> 55¶.  Social media posts were replete with hate speech (e.g., Hasidic Jews "infiltrate
> our local governments" and "rape[ ] our school budgets"). Id. ¶ 70.
>
> This antisemitic rhetoric did not take place in a vacuum. ADL has been
> documenting concerning trends with respect to antisemitic hostility in Rockland
> County, including the following incidents in 2017-18:
>
> - Spray-painting "no Jews" and "no J" on a home for sale in Haverstraw;
>
> - Displaying a sign in a Jewish neighborhood in Monsey that said "STOP
>   MULTIPLYING," a not-so-veiled aspersion to large Orthodox Jewish
>   families;
>
> - Drawing profanity ("F*** all Jews") and genitalia on the front doors of
>   two houses in Spring Valley; and
>
> - Spray-painting the words "No Judios" ("No Jews" in Spanish) on a
>   realty sign that was on the side of the road in Spring Valley.
>
> This hateful rhetoric reached a boiling point in August 2019, when a Rockland
> County political party released an antisemitic video with ominous music in the
> background warning that "a storm [was] brewing" in Rockland County involving
> Orthodox Jews "plotting a takeover" and threatening "Our Homes," "Our
> Families," "Our Schools," "Our Communities," "Our Water," and "Our Way of

Life," reaching the conclusion, "IF THEY WIN. WE LOSE."

Statements like those in Clarkstown are consistent with this sentiment and bear a disconcerting similarity to the calls of community members in Airmont, to "keep Hasidim out"; in Jackson {New Jeresy}, to "get rid of them like Hitler did"; in Mahwah [New Jeresy], to counter an "infiltration" of Orthodox Jews and to keep "the hasidic jewish people from moving" in; and in Chester [New York], to do "everything we can" to stop Hasidic families from moving into the property. See supra 9, 12, 14, 17.

Furthermore, local opposition to [Ateres]'s purchase of the Property included the formation of CUPON of Greater Nanuet—a local chapter of the same CUPON organization that opposed development efforts by Orthodox Jews in Jackson, and which the DOJ identified as "espousing anti-Semitic views"—for the express purpose of preventing [Ateres] from purchasing the Property in Clarkstown. Id. ¶ 62.

Similar community groups were established to oppose developments by Orthodox Jews in Woodcliff Lake [New Jersey] ("Concerned Neighbors & Residents of Woodcliff Lake, Inc."), Toms River [New Jersey] ("TomsRiverStrong" and "Monmouth and Ocean Counties Strong") and Airmont [New York]("Preserve Airmont"). See supra 9, 13, 19.

186.    The ADL also described the responsiveness of Clarkstown officials to complaints and collaboration with community groups specifically created to prevent the growth of the Orthodox Jewish population:

Clarkstown officials, including Supervisor Hoehmann, were directly involved with CUPON of Greater Nanuet, a local chapter of the same CUPON organization that opposed developments by Orthodox Jews in Jackson. See supra 16. This link between municipal officials and anti-Orthodox groups was likewise seen in Airmont, where elected officials were affiliated with the openly hostile "Preserve Airmont" organization. See supra 9.

As Clarkstown considered [Ateres]'s application for a building permit to make improvements to buildings on the Property, town officials, including Supervisor Hoehmann, attended a CUPON of Greater Nanuet meeting at which the attendees strategized how to prevent [Ateres]'s purchase of the Property. Id. ¶ During this meeting, Supervisor Heohmann (sic) stated that he "can't say enough good things about CUPON," and assured the audience that ABY would need a variance under local zoning laws to make any improvements to the Property. Id. ¶ 69. [Ateres]'s application was denied the very next day. Id. ¶ 71.

187.    In 2016, Clarkstown adopted Local Law No. 5 of 2016 (the Town's State/County

Road Law), which added Section 290-20.I(7) to the Town Code, requiring for the first time that in residential districts, "[a]ll uses other than single-family residences shall have minimum frontage of 100 feet and access to either a state or county major or secondary road as classified on the Town Official Map."

188.    The State/County Road Law was adopted by the Town to specifically target religious institutions.

189.    Supervisor Hoehmann stated "[s]chools and houses of worship in areas where they're not allowed by the zoning is something I don't favor" and "I wouldn't move away from that."

190.    Supervisor Hoehmann made these statements despite the fact that the New York Court of Appeals has held that there is an "inherently beneficial nature of churches and schools to the public". *Cornell Univ. v. Bagnardi*, 68 N.Y.2d 583, 594 (NY 1986).

191.    In November of 2017, Clarkstown utilized the Town's State/County Road Law to prevent a church from building a structure and instead purchased the property from the church.

192.    Clarkstown Supervisor Hoehmann stated that the agreement for Clarkstown to purchase the property rather than for the church to be built "is another bold step in protecting Clarkstown from overdeveloping in residential neighborhoods while protecting the quality of life our residents demand and deserve."

193.    Clarkstown residents and the ZBA have suggested that Rabbi Horowitz should pray at West Clarkstown Jewish Center on West Clarkstown Road.

194.    This is not a solution.

195.    First, West Clarkstown Jewish Center is not an Orthodox synagogue.  Rabbi Horowitz beliefs require him to pray in an Orthodox Jewish synagogue.

196.    Even if West Clarkstown Jewish Center was an Orthodox synagogue, it is a 25-minute walk from Rabbi Horowitz's house.  Most of that walk is on West Clarkstown Road, which is a double yellow-lined road that leads to a turn-off to an entrance to the Palisades Interstate Parkway.

197.    There are no sidewalks on most if not all of West Clarkstown Road.

## Legal Violations

198.    The Defendants' actions described above all took place under color of state law.

199.    The Board has burdened Plaintiff's religious exercise by prohibiting Plaintiff from using his home for prayers with the local Orthodox Jewish community.

200.    The construction activity related to Plaintiff's addition would affect interstate commerce.  The construction's effect on interstate commerce would result from, among other things, the transfer of funds to those Plaintiff engages to construct the addition; the engagement of construction companies to construct the addition; the employment of and payments to construction workers either by Plaintiff or by companies engaged by him; the purchase of necessary materials to perform the renovation; the use of interstate highways for the transportation of persons and materials used to construct the renovations; the use of interstate communication related to the renovations; and other commercial activities related to the addition.

201.    The November 10, 2025 denial of the Application severely impedes and prevents Plaintiff's religious exercise.

202.    The ZBA's denial prevents Plaintiff from engaging in certain aspects of his religious exercise.

203.    Plaintiff had a reasonable expectation that his use would be permitted on the Property.

204.    The ZBA's decision denying Plaintiff's Application was not conditional; rather, it was final.

205.    The ZBA's application of the relevant land use regulations to Plaintiff was arbitrary and capricious.

206.    The ZBA's denial was directly related to Plaintiff's religious exercise.

207.    Plaintiff lacks any feasible and ready alternatives for his religious exercise.

208.    There is no compelling or legitimate governmental interest justifying the denial of Plaintiff's Application.

209.    The ZBA's outright denial of Plaintiff's Application is not the least restrictive means of achieving any governmental interest.

210.    To the extent that Plaintiff cannot engage in his religious exercise without changing the use of property to a Place of Worship, as suggested by the ZBA, the Town of Clarkstown has also burdened Plaintiff's religious exercise by requiring that places of worship be located on State and County roads.

211.    The nearest State or County road is located approximately 0.6 miles away from the Property (or other members of the Orthodox Jewish community living near Rabbi Horowitz) at its closest point, and the roadway leading to such County Road lacks sidewalks, shoulders, or streetlights.

212.    Walking to the nearest State or County Road would be extremely dangerous, especially during night or inclement weather.

213.    Prohibiting places of worship from most roads in the Town and requiring them to be located on State or County roads is not the least restrictive means of achieving any governmental interest.

214.    The Town's adoption of the State/County Road Law was motivated by animus toward religious institutions in general and to Orthodox Jews in particular.

215.    The Board's decision denying the Application was motivated by animus toward Orthodox Jews.

216.    Both actions by the Town and Board were taken amidst a background and hostility toward Orthodox Jews in Clarkstown.

217.    The ZBA's decision departed from established procedural and substantive norms.

218.    Statements by ZBA members and local residents to whom the ZBA was responsive indicated hostility toward the Orthodox Jewish community.

219.    The burden on Plaintiff's religious exercise was foreseeable by the ZBA

220.    The burden on Orthodox Jews created by the Town's State/County Road law was foreseeable by the Town.

221.    The Board's decision on the Application was a final decision and was not reviewable by any other administrative body.

222.    Less discriminatory avenues other than banning places of worship from Town roads were available to the Town.

223.    The harm to Plaintiff caused by the Defendants' laws and actions, which prevents him from using the Property to accommodate his religious needs, is immediate and severe.

224.    Plaintiff has also suffered financial damages as a result of the Defendants' laws and their application to Plaintiff.    These include the professional costs incurred in pursuing the application.

225.    There are no quick, reliable and viable alternative options for Plaintiff's activities.

226.    Plaintiff has no adequate remedy at law for the harm and damage caused by Defendants' wrongful laws and actions.

### AS A FIRST CAUSE OF ACTION
### Religious Land Use and Institutionalized Persons Act of 2000
### "Substantial Burdens"
### 42 U.S.C. § 2000cc(a)

227.    Plaintiff repeats and realleges paragraphs 1 through 226 as if fully set forth herein.

228.    By denying the Application, Defendants have deprived and continue to deprive Plaintiff of his right to the free exercise of religion, as secured by RLUIPA, by implementing land use regulations in a manner that places a substantial burden on Plaintiff's religious exercise without using the least restrictive means of achieving a compelling governmental interest.

229.    Defendants' actions have caused significant damage to Plaintiff.

230.    Defendants are liable for the damage caused to Plaintiff, and should be enjoined from further violating Plaintiff's rights.

### AS A SECOND CAUSE OF ACTION
### Religious Land Use and Institutionalized Persons Act of 2000
### "Nondiscrimination"
### 42 U.S.C. § 2000cc(b)(2)

231.    Plaintiff repeats and realleges paragraphs 1 through 230 as if fully set forth herein.

232.    By denying the Application, Defendants have deprived and continue to deprive Plaintiff of his right to the free exercise of religion, as secured by RLUIPA, by implementing land

use regulations on their face and as applied in a manner that discriminates against him on the basis of religion and religious denomination.

233.    Defendants have caused Plaintiff to suffer, and to continue to suffer irreparable harm.  Plaintiff will continue to suffer such damages unless Defendants' acts and conduct complained of are permanently enjoined.

234.    Defendants' actions have caused significant damage to Plaintiff.

235.    Defendants are liable for the damage caused to Plaintiff, and should be enjoined from further violating Plaintiff's rights.

### AS A THIRD CAUSE OF ACTION
**Violation of Religious Land Use and Institutionalized Persons Act of 2000**
**42 U.S.C. § 2000cc(b)(3)(B)**
**"Exclusion and Limits": Unreasonable Limitation**

236.    Plaintiff repeats and realleges paragraphs 1 through 235 as if fully set forth herein.

237.    The Town's State/County Road Law is unrelated to any reasonable limitation on where religious organizations may locate within the Town of Clarkstown.

238.    By adopting the State/County Road Law, and by denying the Application, Defendants have deprived and continue to deprive Plaintiff of his right to the free exercise of religion, as secured by RLUIPA, by imposing and implementing land use regulations both on their face and as applied to Plaintiff in a manner that unreasonably limits religious assemblies, institutions, and structures within their jurisdiction.

239.    Defendants have caused Plaintiff to suffer, and to continue to suffer irreparable harm.  Plaintiff will continue to suffer such damages unless Defendants' acts and conduct complained of are permanently enjoined.

240.    Defendants' actions as aforesaid, have caused significant damage to Plaintiff.

241.     Defendants are liable for the damage caused to Plaintiff, and should be enjoined from further violating Plaintiff's rights.

## AS A FOURTH CAUSE OF ACTION
### Free Exercise Clause
### United States Constitution,
### First and Fourteenth Amendments
### 42 U.S.C. § 1983

242.     Plaintiff repeats and realleges paragraphs 1 through 241 as if fully set forth herein.

243.     Defendants' laws (both on their face and as applied to Plaintiff) and actions deprived and continue to deprive Plaintiff of his right to free exercise of religion, as secured by the First Amendment to the United States Constitution and made applicable to the States by the Fourteenth Amendment, by burdening their religious exercise and by discriminating against him based on religion.

244.     Defendants have caused Plaintiff to suffer, and to continue to suffer, irreparable harm.  Plaintiff will continue to suffer such injury unless Defendants' acts and conduct complained of are permanently enjoined.

245.     Defendants' actions have caused significant damage to Plaintiff.

246.     Defendants are liable for the damage caused to Plaintiff, and should be enjoined from further violating Plaintiff's rights.

## AS A FIFTH CAUSE OF ACTION
### Freedom of Association
### United States Constitution,
### First and Fourteenth Amendments
### 42 U.S.C. § 1983

247.     Plaintiff repeats and realleges paragraphs 1 through 246 as if fully set forth herein.

248.     Defendants' laws (on their face and as applied to Plaintiff) and actions deprived and continue to deprive Plaintiff of his right to freedom of expressive association, as secured by the First Amendment to the United States Constitution and made applicable to the States by the Fourteenth Amendment, by intruding upon Plaintiff's right to associate for purposes of protected expressive activity.

249.     Defendants have caused Plaintiff to suffer, and to continue to suffer irreparable harm.   Plaintiff will continue to suffer such damages unless Defendants' acts and conduct complained of are permanently enjoined.

250.     Defendants' actions have caused significant damage to Plaintiff.

251.     Defendants are liable for the damage caused to Plaintiff, and should be enjoined from further violating Plaintiff's rights.

### AS A SIXTH CAUSE OF ACTION
### United States Constitution
### 42 U.S.C. § 1983: Fourteenth Amendment
### Equal Protection Clause
### Religious Discrimination

252.     Plaintiff repeats and realleges paragraphs 1 through 251 as if fully set forth herein.

253.     Defendants have deprived and continue to deprive Plaintiff of his right to equal protection of the laws, as secured by the Fourteenth Amendment to the United States Constitution, by discriminating against Plaintiff on the basis of his religion and religious denomination.

254.     Defendants have caused Plaintiff to suffer, and to continue to suffer irreparable harm.   Plaintiff will continue to suffer such damages unless Defendants' acts and conduct complained of are permanently enjoined.

255.     Defendants' actions as aforesaid, have caused significant damage to Plaintiff.

256.     Defendants are liable for the damage caused to Plaintiff, and should be enjoined from further violating Plaintiff's rights.

## AS A SEVENTH CAUSE OF ACTION
### New York Civil Practice Law and Rules Article 78

257.     Plaintiff repeats and realleges paragraphs 1 through 256 as if fully set forth herein.

258.     The ZBA Decision wrongly denied Plaintiff's application for a use variance, and the bases for ZBA Decision were arbitrary, capricious, and contrary to New York State law, and should be annulled and vacated pursuant to Article 78 of the New York Civil Practice Laws and Rules.

259.     The ZBA's decision was arbitrary and capricious and not supported by the evidence.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff demands Judgment as follows:

A.     Declaratory judgment holding the ZBA's denial of the Application to be unconstitutional and illegal under the United States Constitution and RLUIPA;

B.     Declaratory judgment holding the Town's State/County Road Law to be unconstitutional and illegal under the United States Constitution and RLUIPA;

C.     Annulment of the Town's State/County Road Law;

D.     Vacating the ZBA decision denial the Application pursuant to New York Civil Practice Law and Rules Article 78;

E.     Preliminary and permanent injunctive relief requiring the ZBA to grant the Application;

F.     Preliminary and permanent injunctive relief enjoining all Defendants from preventing Plaintiff from constructing the addition as stated in his Application;

G.      Preliminary and permanent injunctive relief enjoining all Defendants from applying the Town's State/County Road Law to Plaintiff's use of his Property;

H.      Preliminary and permanent injunctive relief enjoining all Defendants from unconstitutionally and illegally applying the provisions of the Town's Code, as described above, to violate Plaintiff's civil and constitutional rights;

I.      Compensatory damages against Defendants in favor of Plaintiff in an amount to be determined by the Court;

J.      An award to Plaintiff of full costs, disbursements and attorneys' fees, to the extent permitted by law, arising out of Defendants' actions and land use decisions and out of this litigation; and

K.      Granting such other, further and different relief as this Court deems just, proper and equitable.

Dated: Nanuet, New York
        January 20, 2026

Joseph A. Churgin (JC 6854)
Savad Churgin
55 Old Turnpike Road, Suite 209
Nanuet, New York 10954

Roman P. Storzer (to file to be admitted
*pro hac vice*)
Storzer & Associates, P.C.
1025 Connecticut Avenue, N.W., St. 1000
Washington, D.C. 20036

*Attorneys for Plaintiff*

40